Good morning, Your Honor. My name is John Cluxtal, and I represent Joe Henga in this appeal. I'd like to reserve three minutes for rebuttal. All right. We'll try to watch your clock with you. Joe is a disabled young boy. He is inflicted with autism, the Asperger's form of autism. He's pretty high-functioning. He reads well, but like other Asperger's and autistic children, he doesn't understand social cues. He doesn't understand how the intonation or volume of his voice might affect someone. He doesn't understand jokes. And that was diagnosed in 1999 by his counselor, Maggie Stroud, and his psychologist, Dr. Kimsey. Joe was going back to West Middle School on January 31, 2000. His counselor, Maggie Stroud, had a conference, a telephone conference with his teacher, Karen Scott, at that time. She explained to Ms. Scott that Joe had significant problems in dealing with isolation. She needed to redirect Joe, meaning don't yell at him across the room, stop whatever you're doing, that he had problems with cameras being focused on him, and that he needed a structured environment that didn't change. And if you were going to change Joe's environment, you needed to explain it to him in advance and tell him, Joe, this is what we're going to be doing. What is the significance of the counselor's discussions with the parents and with the school district about handling this disability? Where I'm kind of lost is, number one, on the negligence claim against the county. I'm trying to find the duty, because as I understand the negligence is calling Officer Weeks in the day of the incident of the 25th. So what is the significance of these, number one, the previous incidents, and this, if you will, counseling advice, like this is what you must do. Are you saying that then the teachers in the school must act as not teachers, but as some sort of medical, pseudo-medical folks in handling the disability? And as that, what is the breach of duty then, with all that in place? Your Honor, under Idaho law, the school district has a responsibility to protect the health, morals, and welfare of the children. Okay, that I understand, and that's for all children. But now we're in a special ed room with folks that have special problems and with a teacher who has now been advised by a counselor on the outside about the handling of this one child. Is that going to your breach of duty? Is that defined in any way in your breach of duty in your negligence claim? Yes, Your Honor. And how does that fit? Under the ordinary standard of care, you have to do what a reasonable person would do under the circumstances. Which reasonable person, the teacher or the officer? I'm just talking about the teacher right now. So you're talking about the school? The school. Okay. These facts relate to both. But our negligence claim against the school is based on the teacher's failure to follow the direct instructions that were given to her. I'm sorry. Yes, Your Honor. Well, that's where I'm lost. I was trying to find out where the negligence claim that survives with the school, but all I can find is it's related to Weeks and Weeks' use of excessive force. It seems as though you're saying that Weeks as a third party is the one that caused the problem and that the breach of duty is calling in Weeks. That's what I was worried about, that you were going to drop down one level, and I can't find that anywhere. I can't put that together. I know what was said, but I can't put it together. No, Your Honor. Our negligence claim against the school district is based on Karen Scott's failure to follow the specific instructions that were given to her, which led to this reasonably foreseeable effect. Where is that pled? And where is that – I don't – maybe I'm lost. Maybe I didn't see that somewhere. Well, Your Honor, it was the basis for our negligence claim. In our amended complaint, my best recollection is, without having it in front of me, is that we claim the school district, Karen Scott, failed to follow instructions which were specifically given to her by the counselor, Maggie Stroud. I'm pretty sure that's true. But then the consequence of that is the use of excessive force? The consequence of that – on that issue, that brings up an interesting question, because the confrontation at the door of that classroom, whether it be excessive force or not, does not affect our negligence claim. Okay. Meaning if I'll – What is your theory? I mean, I see that you said they didn't follow instructions. So then you'd have to say, and that caused X, and from X I have damages. So what's the – what did it cause, and then what were the – at least the alleged damage? Well, at least based on February 18th, which is the week before the incident issue, we know, everyone knew, that if they cleared the room, Joe was likely to try to leave the room with his fellow students. So then the instruction with regard to Joe had to be carried out explicitly by the school, regardless of anybody else in the room, or else they would become negligent. And then I also read in your briefs where you say that the other act was not allowing Joe to leave with the other kids. Is that right? Even though he was in a mode of disobedience. Is that correct? Your Honor, I don't know that that's part of my claim. My claim is really – I'm reading your briefs, and you said that the incident on the 18th, there's a disobedience problem. So they brought in the police officer Weeks. They blocked door one. Joe tries to get out of door one, and they sort of passively block him off. He sees door two open, so he tries to go over there. Police officer Weeks goes over there, passively blocks him, and he tries to crawl between the legs and strikes her somehow. Eventually told him to go back to your seat, and he does. So that situation resolved itself. And so the issue that I'm trying to get together is that both on the 18th and the 25th, the whole action was to try to contain Joe in the room away from the other folks, which is contrary, as you say, to what the instructions were. So can an outside counselor dictate to school how to handle the inside with the total class so that they can take care of Joe, but to the disregardance of what they may deem appropriate for the school, I guess. I'm trying to sort that out with regard to the duty. I think I can help you in that regard. An outside counselor cannot dictate the school's behavior. But if an outside counselor, in this case, gives specific instructions on how to deal with a young man that will help that young man, and then the school district points a camera at him, isolates him in the middle of the room, punishes him for failing to do a self-evaluation, which the teacher was specifically told he could not do. And then in response to him, his crime in this case was tapping out London Bridge as falling down. Could you just answer, Judge, if you would answer Judge Brunetti's question, I think I'd understand it better. I'm having some trouble with the case both along the line of Judge Brunetti's question, which you started to answer but didn't complete an answer on, which is, is there a duty of the school to follow what some counselor says? And then second, I'm having trouble with what Judge McKeown asked you about, but I didn't think you answered that, which was, what is the damage? If that's the negligence, what's the damage that you're claiming? Because just to give you a third issue to juggle, I have real trouble with proximate cause in this case. Assuming that there could be negligence for not doing what the counselor said, that is, they didn't redirect him, you know, they focused the camera on him, they sanctioned him or tried to corral him because he was disrupting the class, assuming that could be negligence, I don't see how you can have proximate cause of damages caused by alleged police brutality or excessive force. I don't see how that meets the proximate cause test that I just maybe studied too long ago, Paul's graph and all that. You know, like, where do you draw the line? Could it be foreseeable that police would use excessive force? It's an independent policeman, a policewoman. So again, I'm having trouble on the scope of the duty, but I'm also having trouble on what damage did it cause, which Judge McKeown asked you, and I didn't think you really answered that. And the area in which I'm having trouble with that is, is it, is proximate cause made out? And I saw your assertion in a brief that there's definitely proximate cause because this is foreseeable. But based on the evidence that was before the judge, I'm not certain that that's correct. So anyway. Maybe you can just answer in three easy parts. What's the negligence? What does a proximate cause? And what are the alleged damages? So I'll start left with duty. As I started to say, Maggie Sproud cannot dictate to the school district how they will treat their children. But if a teacher is informed how to deal with a child and then doesn't act on that and it causes the child to end up in a situation that is, that causes damage, then we at least have a question of fact on whether. So if conditions are dictated by an outside third party to a special education teacher with nothing in her record about her training or her instructions from the school and she doesn't do that, then there's a breach of duty dictated by this outside standard. Well, there's at least a question of fact, I think, Your Honor. Okay. So let's say that's the breach, whether, you know, we don't have to agree with you, but that's the breach. What does it cause? Well, Your Honor, it caused the confrontation. It caused Joe first to escalate. He's tapping out. One of his bridges is falling down. You can see that he's becoming more and more stressed as more stressors are added on him. When the camera is focused on him, he's asking, why are you pointing the camera at me? Do you think I'm stupid? And they're trying to tell him they're not pointing the camera at him. And so he's sitting there. He's getting more and more agitated based on things that they know will agitate him. And then it causes a confrontation at the door because they know when they go. Okay. And the confrontation is with the teacher or the officer? On February 25th, it was with the officer. Okay. So the breach of the duty causes him to get more agitated, which causes a confrontation. And are the damages then the same as the excessive force damages? I mean, it's the you then have the officer intervenes in a way. I think I should distinguish something there, Your Honors. Okay. The jury could find, I think, that excessive force was used in this case. Right. If they didn't find that excessive force was used in this case, I think they could still conclude that the school district was negligent. Right. I mean, I agree that they're not mutually exclusive because they're different standards. You couldn't have one without the other if it went to trial. Is that sort of a teacher malpractice? You know, Your Honor, that is something that Mr. Julian said below. I'm not aware of teaching. What he's saying is the conduct of the teacher in not following orders of an outside third-party counselor, quote, medical person. And there's nothing in the record that shows the qualifications of the teacher or the duties of special. I'm having trouble of the atmosphere of the special ed room is the atmosphere to try to teach academically folks that can't understand or comprehend and or deal with the disabilities that are causing the teaching problems. And so, therefore, does that escalate the overall duty that I understand of the school to keep the students safe? Because if it's just to keep the students safe and you analyze or you characterize the tapping as a crime, it ends up, I have a hard time with that because it ended up that they took the child to a medical facility to treat him medically. They didn't put him in jail. They brought him to a mental hospital, a medical hospital, so they could deal with his inability to deal with the situation. So the whole thing just is very difficult for me to put a handle on. Okay. Let me try to approach it from a different angle then. Generally, a duty arises whenever you undertake a task to do something. In this case, the task was to teach Joe Hyangka. Now, the standard of care that will be applied is what was reasonable under the circumstances for this teacher under her circumstances. Was there any expert? This was not dismissed on the pleadings. It was a summary judgment, right? Right. And was there any expert evidence submitted by affidavit on your side saying that, you know, like someone, I'm an expert in special education, and in my opinion, the teachers and administrators were negligent in not following the advice of the counselor? Is there anything like that in the record? No, Your Honor. I didn't see anything like that. So I'm having trouble with what evidence you showed of a breach of duty. The answer to your question is no, Your Honor. There was nothing, no affidavits made like that. But that would make it akin to a medical malpractice case where under Idaho law, you have to have the expert evidence from another doctor saying this is the duty and this is how they breached it. I'm not saying it's a medical malpractice. But you have to do something to prove there was a breach of duty, that what the teachers, what the special ed teachers or the school principal on the 18th or the vice principal on the 25th, if those are the right dates, that they did something that wasn't ordinary care. And I don't see how you do that without an expert. Well, didn't the district court, you were barred under the various Idaho statutes, correct? That's right. The negligence issue was not risen by either of the defendants in their briefing for the summary judgment or by the district court in his decision. Is taking down, i.e., restraining a 14-year-old with a disability in a special ed classroom who's having an interaction problem with the system, is handcuffing and dropping that person to the ground to control that person, either for himself or others, per se, excessive force, by a police officer who's called in to deal with the behavior problem? It's not per se. It's not per se, okay. It's not per se. Is it what a reasonable officer would assume has to be done in action to defeat him? Was there any testimony that when a child such as this, with his age, his weight and temperament and his disability, that the easiest way to control him would be to restrain him and put him down? Because there was no injury, but the tape is gruesome in the sense that it shows the tape down and the screaming, but was there any evidence shown that what was done was brutal versus law enforcement attempting to restrain someone with certain disabilities in a certain circumstance? Yes. And what was that? On February 18th, this officer had a similar experience with this little boy, and she knows that he's under 5 feet tall. She knows that he's disabled, and she knows that his gait is unusual. He has no physical prowess. So on February 18th, she stands at the door of the classroom, and Joe gets down on his hands and knees and tries to get around her, and he can't even do that. I thought he hit her on that date, and there was a dispute whether it was intentional hitting or just his arms were flailing, but in any event, he hit her. There is a dispute about that, and at summary judgment stage, I think we have to conclude. I thought there was no dispute that his hand struck her. His hand hit her. Well, I think the testimony is she reached out to grab him. He flailed. Okay. So his hand hit her. Whether it was intentional or not, there's a dispute, but not that his hand hit her. I'm sorry, but in Judge Brunetti's question, I thought was, did you have any evidence that this force was excessive in that circumstance? You're talking about what happened the prior week, but was there any evidence submitted on that issue of excessive force? In Headwaters' force, Your Honors, this Court held that prior experiences with a particular defendant are evidence of what is reasonable force. And that's correct. And in this case, the second incident was different, though, right or wrong in the escalation. As I understand the evidence coming in, when Weeks was called in by the vice principal, said, Bring in Weeks in. Clear the room. And it escalated. Joe tried to get out of the room and start pushing, tried to get his way out. He didn't crawl on the floor.  He started pushing so hard that, as I understand, Weeks tried to push him into a special something area. At that point, I don't know what happened, very frankly, because we were watching the video. It's kind of difficult to see. But Joe was pushing back against Weeks. And so then the question is, is it reasonable for Weeks at that point to decide, in order to stop this, I'm going to handcuff, which then led to the takedown, which then led to the leg shackles. So I'm just wondering if there's, if we can rely entirely on the prior incident, which, in fact, when Joe was told to sit down in the prior incident after he tried to get through door two, he did. So it diffused itself. This was not diffusing. I don't, at least I can tell you. Joe was not. The question is, was there evidence, at least as I understood judgment in his question, he's asking you, please answer if there is or isn't, and then you can explain. Was there evidence that a police officer's use of a takedown in that circumstance was excessive? Yes. Like evidence in the sense of testimony of someone? You mean by an expert? An expert or a non-expert. Any, was there any testimony that that was excessive? Maggie Stroud, his counselor, thought that it was excessive. She was offended by it. I think different people who watch this videotape have different reactions, which means summary judgment is not appropriate. The videotape is very disturbing. I've watched it three times and tried to understand everything that happened. But I'm still troubled by whether there's any evidence of excessive, that the force is excessive under the circumstance. It kept escalating, and this poor kid kept kicking his feet and hands more. And I thought I heard on the tape while I was listening to it that at one point the child even said, I'm going to kill you. Am I right in that, that there's a threat? I think you are, Your Honor. That is well after excessive force. I understand, but if the takedown itself, if the takedown itself was permissible to restrain him, and it's done, you know, kind of like typical police judo type, take someone down without hurting them and immobilizing them, if that's legitimate, then after that it seemed like all the escalation just led to more restraint. And it's hard to see how it's excessive. I think the key, and I'll just sum it up, the key to our excessive force claim is this is a disabled boy, and this circuit has held that you take that into consideration. This was more force than what was necessary, and we based that on the February 18th incent. This officer knew that she could simply grab this little boy, return him to his seat. Joe, I don't know if, Your Honor, you were saying that he was the aggressor in this, but as I look at that videotape, he's running, trying to go around Officer Weeks. She pushes him this way and takes him across the room and takes him down. I did not, my view of that videotape was not that Joe was the aggressor. All right. Let's hear from the school and the officer's counsel, please. May it please the Court, Counsel, my name is Brian Julian. I represent the school district. We'll be sharing our time ten minutes aside. All right. Yes, Your Honor. The issue in this case has been limited only to negligence. The various causes of action have been eliminated at this point in time, so now we look at negligence. One way to look at it, as the various questions have indicated, is but for the actions of the officer, the seizure, the force that may have been reasonable, may not have been, is there any damages at all that could happen in this case? By vacating a classroom, is there any cognizable cause of action because of what the school district did? I submit there is absolutely not. Clearly, this case arises out of a couple of intentional torts. That would be, allegedly, false imprisonment, false arrest, or a battery. For those, we contend that the Tort Claims Act, under which all negligence claims must be based, immunizes this type of conduct. But this is a little bit different than most cases because, clearly, the officer is an independent contractor. And under the Tort Claims Act, the governmental entity, in this case the school district, is liable only for its employees. In this case, the school district had no means of controlling the methodology that the officer used. Of course, the school district is the one who called her up. What's up? The school district is the one that invoked her services. She didn't just land in the classroom. Absolutely right. So right there, if there is a potential negligence claim, as he explained, it's that the school district didn't use alternative means and they immediately call an officer. And the officers at the school there during the entire school period, for any disturbance that's called, it's interesting that we're now talking about this because Judge Boyle had asked plaintiff's counsel during oral argument, are you contending that simply by calling an officer to the scene, is that negligence? The response was no, Your Honor. I'm just trying to sort out what is the claim. That's not negligence, simply calling an officer to the scene. Yeah. When we tried to discuss this, it seems as though it was sort of like because the teacher had not followed the third party outside counselor saying you wouldn't have to call the officer if you would have redirected, take the camera off, whatever. So there seems to be a contradiction there somewhere. Well, and let me explain that, how the system actually works, because ironically it's controlled by federal law with special ed students. This diagnosis of Asperger's syndrome, which is a form of autism, was given to the school district nearly seven days before. At that point in time, there was a communication apparently between the parent and some type of study done not by a professor or anyone with any known credentials, but it appears to be a student paper at University of Michigan was taken off the Internet and given to the school district. Under federal law, we control special ed students by an individual education plan, usually known as an IEP. We're very familiar with those. Okay. As you are well aware, under federal law, the school district has 30 days from the time of a changed diagnosis to meet with a multidisciplinary team, which would include the school psychologist, the administration, the teachers, and the parents in determining what will be the future steps of the IEP. And the only thing in the record that I found was Teacher Scott did call the counselor, whatever her name was. Right. And I guess they had a discussion about what she told them about how to handle it. Well within the 30 days required by federal law, in fact, on the 1st of March, an IEP team was convened, and it was decided that actually this student would be homebound because of his uncontrollable behavior. Now, this is not in the record. This is not in the record, so we can't consider this. This in February occurred before the time had run to set up an IEP plan, and there was no IEP, right? The IEP was in existence, but it dealt with prior diagnosis. Prior, but there was no new IEP. Absolutely. There was no IEP in light of what the counselor had said. That's correct, Your Honor. And so what the school district was bound to follow was the formally agreed-to IEP, which had a little bit different scenario because he was diagnosed with obsessive-compulsive disorder and attention deficit disorder, which perhaps would have been a little bit different way of handling the situation. I don't think that's correct. Well, for the school district, it would help me if you just focused on one thing. I mean, there's a lot of claims. Yes. And the other judges will tell you if they have concerns about the other. I think most of them follow out the question of the negligence claim, which could survive under these various statutes. So why, in your view, should the negligence claim be dismissed? Why was that appropriate? The negligence claim, A, we are not responsible for the actions of the school officer. And simply calling for assistance of law enforcement, as the plaintiff admitted during oral argument at summary judgment, is not negligence. It seems to be an admission there, nor should it be. They're clearly an independent contractor. The Tort Claims Act actually defines employee under Idaho Code 6-902, and it excludes independent contractors. It can be servants that aren't even paid, but it specifically excludes independent contractors. Therefore, their theory that we put this person in a position of apparent authority really doesn't hold water. We have to look at the statute, which waives sovereign immunity, and you cannot have a cause of action where we're liable for the independent contractor. Secondly, is this information given by a parent outside the normal realms of an IEP, which is the statutory way in which we control special ed, sufficient notice to change the behavior and create a duty of the school district? I submit it's not. Was that argument made down below with regard to the IDP hadn't been made yet? Only in oral argument, not in briefing. I didn't see the briefing. But to tell you the truth, the reason that was done that way is the way the case was pled, it seems that there were two things alleged negligence against the school district. A, negligently supervising an independent contractor. We're likely immune for that, but there's really no duty to supervise a police officer and get involved. The second duty seemed to have been calling in the officer. So all of a sudden, at oral argument, it seemed that we were starting to talk about what was a reasonable step, and really almost in the context of a professional malpractice setting. It should be noted that to be a teacher, you do have to be licensed by the state of Idaho and pass certain certifications. They are professionals. These are professionals on what they do. There is a debate on how to handle this situation, but is this negligence? I don't think so. What did the school do? The school emptied out a classroom and tried to stop a student with probably less than 20 to 30 seconds involved. This student had spit on a teacher after being reprimanded. He started acting like some violent tendency was going to go on. I would submit. Let's stop on that, to be fair. Everyone who testified said there wasn't any risk to the other children, correct? There was no imminent risk. Okay, there was no imminent risk to any other children. And he didn't do anything that suggested he would become violent. Is there anything in the record to support the statement you just gave? Yeah, well, there was the teacher, I believe her name was Sherry Turner, in her deposition, which isn't part of the record, that said, no, she was reprimanding another boy named Seth. This, Mr. Hyenga, got involved with that, said, why are you doing that? Lunged forward and spit on her, is what her testimony says. That's where she got concerned. But spitting is a little different than being subject to imminent attack, is it not? Well, what we're doing is Monday morning quarterbacking here. No, we're not with respect when we talk about the excessive force. You're laying the groundwork on behalf of the school as to what happened, and that is going to play right into our next discussion. I want to make sure that we're not shading the facts unfairly at this time. And I will be as fair as I can to Mr. Hyenga. The school district did testify they didn't see any imminent threat, but they thought the proper thing to do would be to evacuate the schoolroom. Let me take just one second. Approximate cause for just a second. Assuming that there's negligence of school administrators or the teacher in not redirecting them and somehow leading to a confrontation, can the damages asserted based on excessive force be viewed as approximately caused by that antecedent negligence? I don't think so. The closest case we'd have is where we have a teacher who has proclivities to attack other students. In this instance, there is no known proclivity of this particular police officer to take any type of violent action. The only proclivity we knew of is that the student may act up. So we even had a prior incident one week before where the officer was struck in the chest by the student, whether intentional or not, but didn't act violently. That would be the only way there would be any negligence, is if we had noticed that this particular officer would act inappropriately. We didn't take steps to change assignments, and that's about all we could do. Frankly, once the officer engages, it is against Idaho law for us to interfere or delay or obstruct in any manner the officer's duty. We certainly can't have a common law duty that would run contrary and put the school district at risk of being guilty of a misdemeanor for obstructing an officer. There's no way we can control what the officer does. I would suggest to the court that the only way that we can really create what is the proper thing for a school to do is to follow what was on the current IEP, not that there had been a complaint or a suggestion made by the parent. The suggestion made by the parent isn't the way we do things. Okay. I think we have your argument in mind, but you might want to save some time for your colleagues from the city. I will. I'm going to make one last statement. All right. I would like the court just to imagine that instead of evacuating this classroom, the teacher decided to calm things down, and this student grabs a pencil and jabs it in another student's ear and kills the student. We are then going to be saying, why didn't you follow the original IEP? Why didn't you call the police? Why didn't you do everything we did in this case? Thank you. The original IEP, just to clarify that point, did the original IEP call for clearing the classroom in the case of a dispute? It was silent on that, but it didn't identify any type of conduct that would exacerbate the situation. Okay. Do we have it in the record by the way? I don't believe it is. It is discussed in the depositions that are in the record by the special ed teachers. Is it a reasonable standard anyway of what was reasonable for the teachers to do under those circumstances? Absolutely. Absolutely. If we have to look at the whole in a judgment decision, I think it's unfair to second-guess that teacher. All right. We'll hear from the city. May it please the court. My name is Guy Hallam, and I'm here today with Bill Morrow on behalf of the city and Officer Angela Weeks. I believe the court has hit on the big issue as far as Angela Weeks is concerned here today, and that is the reasonableness of her actions in the circumstances that were presented to her. And I have a very serious question about that. I mean, we can all sit here and say, oh, it was so reasonable for her. But here's the question. In the face of a kid who's tapping on a table, who is not committing any crime, who the officer knows is a small kid who has this Asperger's syndrome, the first thing she does is basically take him down. I guess I have a real question as to whether that initial takedown was appropriate and reasonable force, because even in police cases, long before they get to taking people down and handcuffing them, we're seeing if there's reasonable force under the circumstances, and those are people who are suspected of a crime. So why is it even reasonable force, the initial encounter? Your Honor, I think under the undisputed facts of this case, that is not the first thing that she did. In fact, if you look at the videotape, it's rare that we have a videotape of the incident at question. The officer was called into the room by the vice principal, and you can see her arrive in the room and stand at the back of it and just make her presence known. And she's there for some amount of time before the school officials decide to empty the room. As they are emptying the room, the plaintiff, Mr. Hyinga, decides that he wants to go with all the other students. Let's stop right there. This is where I really get into a problem. It appears that on the 18th and the 25th, the procedure was, reasonable or not, by the school district, is something happens, they're concerned about the discipline of the boy, so they decide to clear the room. Now, the clearing of the room is also attendant to the fact that they will exclude the boy, Joe, from leaving. Isn't that the sequence? In other words, we're clearing the room, but Joe can't leave. And Joe wants to leave in both instances. And as I saw the tape in this instance, when on the 25th, the decision is made to bring the officer in, and then the second decision is made to clear the room, Joe tries to leave, so now the officer is in a position to do what? To help prevent Joe from leaving. From what I saw, is that correct? Am I wrong? What was going on there? No, Your Honor, I believe you're correct, if I understand what you're saying. If I can clarify the facts, as far as the officer's involvement on the 18th of February, the room was cleared when she was called. And Mr. Hyinga was, again, attempting to get out of the room through the principal on that occasion. On this occasion, she was called in because of his state of agitation, and I don't believe it's clear in the record whether the decision was made before she was called in to vacate the other students from the room. But she's there when they're going to do it. She is. That's the point. Leeks is there when the operation starts to clear the room, and the only reason he becomes involved is because Joe starts to move and she's trying to push him away. I think that's the only reason she engaged. Am I wrong in reviewing the tape? She engages Joe because he's trying to leave. That's correct. He didn't do anything but try to leave. That is correct. But he did try and leave through her physical presence. But she doesn't say to him, she doesn't try to get him to go sit back down at that point. We don't see that. I mean, basically, instead she tackles him there. I mean, that's really the question I have is it's hard to jump from tap, tap, tap, try to leave room, and the next thing you know the kid is taken down, basically. So I'm still having some problem understanding the reasonableness under the circumstances. And, I mean, you would agree that under the Ninth Circuit case law we look at, for example, in the totality, we look at the mental disability, correct? I would agree with that, Your Honor. And this officer knew that this child had some learning disabilities or emotional issues, correct? She knew that from the 18th. Her testimony is that she knew of some disability but not the nature and extent of those disabilities. Right, okay. And she also knew his size from before. That's correct. And she also knew of the striking on the 18th and the incident on February 11th where she witnessed him lunge at a vice principal. Right. And so she had all of that awareness in her head when she was standing there on February 12th. And did the officer, is there any evidence that the officer did anything other than take him down to try to do any other action? Your Honor, there is. And say what is that? She, if you watch the video and if you read her testimony. And we have. Lately it's a little rainy. It's not the best tape. No, it's not. But we do have a tape. She passively stands in front of him. He is instructed to stay in the room, and I believe it's by his teacher he's instructed to stay in the room. He gets up, he refuses to comply with that, and comes towards her. She puts herself in front of him passively and says, we're not going to do this today at the point of confrontation. And that is based upon her confrontation with him on the 18th. She then directs him away from the door physically, and that's basically blocking him into the corner. There was a timeout room attached. Timeout room, yeah. And she directs him towards that room, but he's struggling and continuing his agitation level. It is escalating, as you can see on the video, and as the record reflects, has been escalating the entire day. There is, you can hear her on the video, and she has testified to this, that she's asking him to calm down. In fact, you can hear her loudly saying it, and that is in response to her meeting with the mother, I believe, on February 18th, where the mother, Ms. Hyenga, informs the officer that what you've got to do sometimes to get him in control is raise your voice. And she does that, and you can hear that going on in the background. You can't see it on the video, but her testimony is clear about that. She instructs him to calm down. He does not. He's yelling, he's agitated, and at that point, she decides to take him down. And he has pushed against her very hard to get out of that position near the timeout room before he is taken down. And that is something that a reasonable officer cannot allow, and that is a suspect or any individual pushing against a uniformed officer in an attempt to escape the control of the officer. And that's exactly what was happening in this case. And after she puts him down, then how long does she have her knee in his back? It's unclear from the record. It does not, from the video, look like her knees are on the side of him after she gets him cuffed. I want to ask you a question. Where is the evidence that she had the knee in the back? I don't see it on the video. I see the knees on either side of him. It's been alleged by the plaintiffs. There is no evidence in the record to support that allegation, and I don't believe the video supports it. She has him handcuffed. She's kind of holding him. She's straddling him. She's straddling him with her knees. She's actually sitting on him, holding him down. She is. She has her hips on top of him and her knees on either side of him. His legs continue. He starts kicking his legs more. He does. He does. And those restraints get more. He's already got the handcuffs on, right? He does at the point he's kicking. He continues to escalate. Is there anything in the record, is there any stipulated transcript of that video that we've all watched? There's not. Because there are a lot of things being said. It's sometimes hard to tell who's saying the things you can hear. Right. There is no stipulated transcript. It says it can have you court-martialed. I mean, we can hear some stuff, but to be honest, whether there's a threat, I think it's pretty hard to say from the video. We can't really discern that. I think the district court alluded to the threat, and he does. It's pretty legible. I mean, not legible, but pretty audible, saying I'm going to kill you at one point. And the district court said something about threats. But would it be helpful to our resolution of the case if we asked, I don't know if we really will want to do this, but if we asked all parties to give us a stipulated transcript of who was saying what on that video? I mean, could that even be done? Your Honor, we can certainly discuss that amongst the parties. I don't know that the video is of sufficient quality for that to be done. There's no testimony on that, right? There's no testimony. I don't think it's in the record below, but don't do anything unless we issue an order. How's that? Certainly. We won't do that. All right. I think any other questions? And we've let you have a little bit over time, and so we'll hear from Mr. Hengist, counsel. Thank you. Thank you. I think you're pretty well out of time, but we'll give you an additional minute for rebuttal. Thank you, Your Honor. One factor I didn't mention earlier is that when we're discussing whether the officer's conduct was reasonable, the de oral decision is instructive from this circuit. And that decision, it was raised by Your Honor's questions. This Court specifically held that a failure to warn a defendant, a person, is also another factor we'll take into consideration. In this case, Joe didn't have any instruction about what he was supposed to do. He was obviously confused. He was never instructed by the officer, you're under arrest. I think Mr. Hallam was accurate in saying as they confronted each other at the door, I think she simply said something like, we're not doing this again. I think that's what she said. So there's no instruction to Joe regarding you can't do this or you have to stay here. Are you saying that no one told him he had to stay in the room? I think the counsel said that the teacher told him he must stay in the room. I don't recall that, Your Honor. I don't think there was any instruction. Certainly there wasn't from the officer. Did you also hear her saying to him that he's got to calm down right before the takedown? Your Honor, I think that's just taking him down. I kind of considered a continuous motion across the room and takedown. There may have been a part where they're off the camera and then you see them going down, but it wasn't that very well. I remember her saying, calm down. I remember him saying, I just want to sit down. Let me sit down. I'm going to call my mom. Please, for the mercy of God, let me go. This hurts. And so I remember her saying, calm down, but I remember him saying some things about I just want to sit down also. We'll go back and look at the record. Thank you to all counsel for your arguments. It's definitely a difficult case. Thank you. The case of Hyenga v. The Nampa School District is submitted. We'll take a short break. The Council for National Wildlife Federation v. The Army Corps of Engineers, if you could get situated and we'll hear from you on our return. Thank you. All rise. This court now stands in recess.
judges: Brunetti, McKeown, Gould